IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | CR C-08-29M |
| | § | |
| ROBERT MARTINEZ | § | |

## MEMORANDUM OPINION

Defendant, Robert Martinez, was driving while intoxicated in violation of Texas Penal Code § 49.04 and 18 U.S.C. §§ 7, 13 on the Corpus Christi Naval Air Station ("CCNAS"). (D.E. 1). Because this incident occurred on a military base in the Corpus Christi Division of the Southern District of Texas, jurisdiction is proper in this Court. 18 U.S.C. § 7; United States v. Reff, 479 F.3d 396, 400 (5th Cir. 2007). A bench trial was held on February 27, 2008.

## TRIAL TESTIMONY

### A.   Kevin Bahr.

Officer Kevin Bahr has served as a Navy patrolman at CCNAS for approximately two years. He is a highly trained patrolman, whose credentials include a two-month training course at Lackland Air Force Base in San Antonio, Texas.

In the early morning of September 22, 2007, Officer Bahr was working at the CCNAS main gate with Officer Jesus Castillo. At about 3:10 a.m., Officer Bahr saw a car approaching the main gate. The driver slammed on the car's brakes because it was going too fast and almost hit a barricade at the main gate.

When defendant, who was driving the car, was waved forward, the officers asked him for identification. Officer Bahr observed that defendant had glassy, bloodshot eyes and that he smelled of alcohol. Based on these observations, additional patrolmen were called to assist Officers Bahr

and Castillo as they were still on sentry duty and had to handle other vehicles that approached the gate.

On cross-examination, Officer Bahr indicated that he did not write any reports relating to defendant's arrest. He also explained that he did not administer any field sobriety tests to defendant. Moreover, he did not ask defendant any questions, but merely observed as Officer Castillo questioned defendant.

Officer Bahr acknowledged that a person could have bloodshot eyes in the early morning for reasons other than intoxication, but testified that defendant was driving erratically and appeared drunk.

**B.      Jesus Castillo, Jr.**

Officer Castillo has served as a Navy patrolman for approximately nine months at CCNAS, but had only served about three months at the time of the incident. However, he has served as a patrolman for about five years. He is a highly trained patrolman, whose credentials include an eight-week training course at Lackland Air Force Base. However, he is not qualified to administer field sobriety tests.

Officer Castillo was working at the CCNAS main gate in the early morning of September 22, 2007 when defendant approached in his car. He observed defendant driving toward the gate at a high rate of speed and then abruptly hitting the brakes. He waved defendant forward and began talking with him. Defendant admitted to Officer Castillo that he was coming from a bar named Shakers, which is on the road that leads to the main gate. Defendant further explained that he was trying to find South Padre Island Drive.

Although it was about 3:10 a.m., the area around the main gate was pretty well lit. During

Officer Castillo's discussions with defendant, he observed that defendant was fumbling with his identification and had glossy, bloodshot eyes. Moreover, Officer Castillo smelled a strong odor of alcohol emanating from defendant. He further explained that defendant's speech was slurred. Based on these observations, he requested a supervisor and another patrol officer.

On cross-examination, Officer Castillo acknowledged that defendant understood his questions and that he could understand defendant's responses. Moreover, defendant complied with Officer Castillo's order to turn off the car and place the keys on the dashboard. However, when defendant exited from his car, he was too unsteady to stand, and had to sit on the ground.

Officer Castillo admitted that there was no videotape available of his interaction with defendant. Furthermore, a search of defendant's vehicle revealed no contraband, such as open containers of alcohol.

**C.     Domingo Serna, Jr.**

Petty Officer Domingo Serna, Jr. became a Navy patrolman in June 2004 and is currently on terminal leave as he retires from active duty. He received specialized law enforcement training both on-the-job and during a month-long course in Little Creek, Virginia. In October 2005, he became certified to administer standard field sobriety tests, including the horizontal gaze nystagmus ("HGN"). He receives yearly refresher courses on administering these tests.

Officer Serna was called to assist Officers Castillo and Bahr because their primary responsibility was sentry duty. They had to secure the lane where defendant's car was and open an alternate lane for other cars to enter as they approached the main gate.

As Officer Serna approached defendant, he detected a strong odor of alcohol and observed that defendant's eyes were bloodshot. Moreover, he noticed that defendant's speech was slurred.

The area around the main gate was well lit. Officer Serna used a battery operated pen light to conduct the HGN test, which checks for involuntary jerking of the eyes. This involuntary movement can indicate intoxication. Defendant removed his glasses prior to the test. On the first attempt to administer the test, defendant failed to follow his directions. On the second attempt, however, defendant followed his directions. Officer Serna found six out of a possible six clues, indicating that defendant was drunk. Specifically, he found that both of his eyes did not pursue smoothly, he observed distinct nystagmus at a maximum deviation, and that the nystagmus onset was prior to forty-five degrees. Gov't Ex. 3; Def. Ex. 2. Officer Castillo observed him conduct this test from his sentry position at the main gate.

Officer Serna's supervisor, Officer Ryan West, who had also arrived at the main gate, also observed Officer Serna administer this test. However, Officer Serna emphasized that he had the best vantage point as he was standing directly in front of defendant.

Next, Officer Serna began to administer the walk and turn test. Defendant appeared to have trouble maintaining his balance, and could not understand or follow Officer Serna's directions. Officer Serna then noticed a scar on defendant's knee and asked him about it. Defendant informed him that he had had knee surgery. Officer Serna also learned from defendant that he was on several medications. He was concerned that defendant's medications were reacting adversely with the alcohol. Taking into account defendant's surgery, level of intoxication, and medications, Officer Serna decided it was unsafe to administer either the walk and turn test, or the one leg stand test. See also Gov't Ex. 3.

Officer West had a portable breathalyser unit and asked defendant for a sample of his breath. Defendant consented, and the sample detected alcohol.

Officer Serna filled out the Alcohol Incident Report.  Gov't Ex. 3.  Officer Castillo completed the narrative of the Incident Report.  Def. Ex. 1.  Officer Serna provided Officer Castillo with information before the narrative was done.  He also issued defendant a citation.  Def. Ex. 2.

On cross-examination, Officer Serna was asked about inconsistencies between his Alcohol Incident Report and Officer Castillo's narrative.  Compare Gov't Ex. 3 with Def. Ex. 1.  Specifically, he had reported that neither of defendant's eyes pursued smoothly.  Gov't Ex. 3; see also Def. Ex. 2 ("Serna observed six out of a possible six standardized clues in Martinez's eyes.").  However, Officer Castillo wrote "SERNA did not observe a lack of smooth pursuit in MARTINEZ'S left or right eyes."  Def. Ex. 1, at 3.  Moreover, Officer Serna admitted that the Alcohol Incident Report did not indicate that defendant failed to follow directions.

Officer Serna conceded that Blood Alcohol Content cannot be determined by the HGN test.  Moreover, he acknowledged that the HGN test was not one hundred percent accurate.  He indicated fatigue, or a medical condition could affect the results of the HGN test.  He admitted that there was no videotape of his interaction with defendant.

Officer Serna acknowledged that defendant answered all of his questions although he had to ask some of them twice.

In the citation, Officer Serna indicated that defendant drove a Ford Taurus.  Def. Ex. 2.  However, defendant's car was actually a Ford Escort.  Def. Ex. 1, at 3.  He explained that these two models have a similar shape.

**D.     Ryan West.**

Officer West has been a patrolman since 2003.  At the CCNAS, he is the patrol supervisor and assistant watch commander.  His training includes being qualified to administer standard field

5

sobriety tests. Moreover, he is trained to use the portable breathalyser.

Officer West arrived at the main gate after Officer Serna. He observed him performing his duties, including administering the field sobriety tests. He also smelled alcohol coming from defendant as well as observed that defendant was unsteady. He heard defendant say that he was coming from Shakers and was trying to find South Padre Island Drive.

After Officer Serna decided against having defendant perform the walk and turn test, or the one leg stand test, Officer West asked defendant for consent to administer the portable breathalyser test. Defendant consented, and he administered the test. Based on the positive results, defendant was placed under arrest and transferred to the security building.

Officer Wood discussed the Alcohol Incident Report, explaining that there were two different sections describing his contact with defendant. The first section addresses the "vehicle in motion," which focused on how defendant's car appeared as it approached the main gate. It indicated that defendant almost struck an object and that he was slow in responding to traffic signals. Gov't Ex. 3. He acknowledged that a number of boxes regarding the vehicle in motion were not checked, including "appears to be drunk." The second section concerns "personal contact" with defendant. That section indicates that defendant admitted to consuming alcohol and that defendant had an odor of alcohol, bloodshot eyes, slurred speech, and unsure balance. Id. Officer West testified that the patrol officers always strive to be accurate, but sometimes things are left out of reports as was the case here.

On cross-examination, Officer West indicated that it was possible defendant was unstable due to his reconstructive knee surgery. However, he also noted that early in the morning, people do not usually arrive at the main gate because they are lost, but rather because they are drunk. He

acknowledged that the portable breathalyzer simply detects the presence of alcohol, but does not establish a specific blood alcohol level. Finally, he admitted that he did not observe defendant as he approached the main gate in his car.

**E.     Roderick Hopes.**

Officer Roderick Hopes has been a Navy patrolman for seven and a half years. He received about six to eight weeks of training to be a patrolman in 2000. It was his duty the morning of September 22, 2007 to conduct breathalyzer tests at the security building.

After arriving at the security building, defendant declined to provide a breath sample. Officer Hopes read defendant a statutory warning regarding his refusal to provide a breath sample. Gov't Ex. 1. He read defendant the entire form. Defendant signed the statutory warning, acknowledging his understanding of the warning as well as his refusal to provide a sample. Id. Significantly, the warning explained that "[t]he specimen will be analyzed to determine the alcohol concentration or the presence of a controlled substance, drug, dangerous drug, or other substance in your body." Id. In declining, defendant did not provide any explanation for his decision and did not indicate that he already had given a breathalyzer sample.

Officer Hopes also read an advisory of implied consent to defendant, who signed this form also. Gov't Ex. 2. This form established that if defendant refused to provide a breath sample, he would not be allowed to drive on CCNAS for one year. Id. Officer Hopes did not indicate to defendant that his refusal would bar him from entering CCNAS for forty days. Defendant understood what was being read to him and signed both forms in front of Officer Hopes.

Officer Hopes testified that he smelled alcohol coming from defendant during his interaction with him. Moreover, he observed that defendant had an unstable gait and bloodshot eyes as well as

was visibly sweating.

On cross-examination, Officer Hopes acknowledged that he did not administer the standard field sobriety tests to defendant. He admitted that there was no videotape of his interaction with defendant in the security building.

**F.      Gary Wayne Cranford.**

Officer Gary Wayne Cranford is the CCNAS range security officer. He has served at CCNAS since June 2005.

Officer Cranford testified that CCNAS is federal government property and that the land was acquired for the use of the United States. Moreover, he indicated that there was a warning sign visible to drivers as they approached the base, indicating that it was federal property. The sign warns drivers that they are about to enter a federal installation and are subject to search and seizure. Finally, he explained that the boundary of the federal property was located about 100 to 120 yards outside of the main gate.

**G.      Robert Martinez.**

Defendant Robert Martinez is forty years old and grew up in Corpus Christi. He works as a freelance construction worker.

On Friday September 21, 2007, defendant awoke at about 5:30 a.m. so that he could get to work early. He worked at his construction job until about 6:00 p.m.

After work, he went to the Harbor Playhouse where he worked as a tech during the production. The play ended about 10:00 p.m., but he left about 9:00 p.m. to go to arrange for the play's crew to eat at TGIFridays. At that restaurant, he ate a hamburger, but did not drink any alcohol.

After leaving TGIFridays, defendant went to a pool tournament at Shakers, arriving at the bar about 10:45 p.m. Upon his arrival he drank a beer, which he described as being about a ten-ounce mug. He only drank one beer because he did not want the beer to affect his performance in the pool tournament. After he was eliminated from the tournament at about 12:30 a.m., he had his second beer. Then he shared a few pitchers with his friends while watching the tournament. He characterized the pitchers as small and as other people came by their table, he and his friends would encourage them to refill their glasses from the pitchers as well. He is unsure how many beers he drank during this time, but testified that he did not drink excessively because he had to work on Saturday. He did not drink any shots or liquor at the bar.

Defendant testified that he stopped drinking around 1:30 a.m. and that the bar closed about 2:00 a.m. Because he used to work at Shakers, he helped the bartenders clean up and close the bar. No one was drinking during this time because that is illegal. When he left Shakers, none of his friends expressed concerns about him driving.

After leaving Shakers, defendant planned to drive to the nearby home of his friend Chris and sleep there because he had been drinking. This friend lived around the corner from Shakers. First, defendant stopped at Stripes to purchase some cigarettes. When he left Stripes, he took a wrong turn and went in the direction of CCNAS. As he approached toward the main gate, he asked a pedestrian he saw whether he could turn around, but was advised to proceed to the main gate. As he drove toward the gate, he did not hit any cones or the barricade.

Defendant denied that he was driving at a high rate of speed because he had cars in front of him. He says that he had his foot on the brake merely to prevent the car from idling forward. He denies that he stopped the car abruptly as he drove up to the gate. Moreover, he pointed out that he

9

was not ticketed for speeding.

When defendant arrived at the gate, he explained to the patrol officers that he had gone the wrong way and wanted to simply turn around. The officers looked into his car which was full of his construction work tools. He was asked whether he had any weapons in his car and he answered that the tools could be used as a weapon. He told them he had some knives, including a hunting knife and a fishing knife in the car, but no firearms. He admitted that he had been drinking when asked by the officer.

After a search of his vehicle, defendant was asked to perform the standard field sobriety tests. He was not wearing his glasses during the HGN test. Defendant testified that he followed Officer Serna's instructions to the letter. He pointed out his swollen knee and explained that he had had surgery. His knee surgery was in 1996 and sometimes it became swollen causing some instability. The officer then told him he did not have to do the tests. He never started the walk and turn test. He told Officer Serna that he could do the one leg stand test on his other leg. After that he was tested with the portable breathalyser.

After defendant was taken to the security building, he was asked to provide a sample of his breath for the breathalyser. He told the patrol officer that he had just taken one. The officer then told him if he refused that he could not come on the CCNAS for forty days. Defendant did not have a problem with that because he rarely came on base. The officer read a form to defendant, but he was not sure what it was about. However, he signed both of the forms provided to him by Officer Hopes. Gov't Exs. 1, 2.

Defendant asserts that he had normal use of his mental and physical faculties and that he never staggered. Moreover, he was fully cooperative with the officers. Defendant has an

astigmatism that was diagnosed a long time ago. His astigmatism got worse when he developed diabetes. Defendant also pointed out that Shakers is a smoky bar and that the smoke irritated his eyes. Moreover, he is not normally awake for so many hours without sleep. In response to Officer Hopes' testimony, defendant also explained that he sweated a lot.

Defendant testified that in his high school graduation class there were eight friends who died, due in large part to alcohol. He and his friends are very cognizant of their friends' deaths. Consequently, they are very cautious about drinking and driving. Usually, they deal with the issue by having a sleep-over at a friend's home, or by taking taxis.

Defendant takes medication for diabetes, high blood pressure, and cholesterol. None of these medications cause any intoxicating effects. Moreover, he understood everything that was going on that night and complied with all requests of him.

On cross-examination, defendant testified that he told the patrol officers that he was a construction worker. He denied telling them that he was a teacher at Baker Middle School.

Defendant admitted that he knew where South Padre Island Drive is and how to get to that street from all over Corpus Christi.

Finally, defendant explained that his friend Chris had a new house so he was not sure exactly where it was. He was following people to the house. He does not know how much he drank at Shakers, but knows that it was not a lot. He was planning on sleeping at his friend's house because he did not want to drive home. However, he had to be at the Harbor Playhouse again on Saturday morning for a work call.

**DISCUSSION**

In order to be convicted of the charge in the criminal information, the Government must prove three elements beyond a reasonable doubt. First, it must establish that defendant was operating a motor vehicle in a public place. Second, it must establish that defendant was intoxicated while driving his car, rendering him incapable of using his normal mental or physical faculties. Third, it must establish that he was driving his car on land acquired for the use of the United States and under its jurisdiction.

The first element is straightforward. Defendant has admitted that he was driving his car on September 22, 2007. Thus, the Government has proved this element beyond a reasonable doubt.

Similarly, Officer Cranford testified that CCNAS was federal property that had been acquired for the use of the United States. Moreover, a warning sign informed drivers that they were approaching federal property. His testimony was uncontroverted. Accordingly, the Government has proved beyond a reasonable doubt that defendant was driving on land acquired for the use of the United States. See United States v. Collazo, 117 F.3d 793, 795-96 (5th Cir. 1997).

**A.     Defendant's Driving.**

Officers Bahr and Castillo testified that defendant was driving too fast, stopped abruptly and that he almost hit a barricade. This testimony is supported by the Alcohol Incident Report as well as the Incident Report. Gov't Ex. 3; Def. Ex. 1. Erratic driving may be evidence of intoxication. See, e.g., Harvey v. State, 173 S.W.3d 841, 847-49 (Tex. App. 2005).

Defendant denies that he was driving erratically. Indeed, he argues that the traffic was such that he was simply idling forward as he periodically took his foot off the brake. I do not believe that traffic was so busy that defendant was simply idling forward toward the main gate at 3:10 a.m. in the morning. Moreover, I find that Officers Bahr and Castillo were credible when they described

defendant's driving as erratic when he approached the main gate.

**B.       The Odor Of Alcohol.**

All five patrol officers who interacted with defendant on the morning of September 22, 2007 testified that he smelled of alcohol. Indeed, Officers Castillo and Serna both indicated that it was a strong odor of alcohol. This testimony is supported by the Alcohol Incident Report, the citation, and the Incident Report. Gov't Ex. 3; Def. Exs. 1, 2. The odor of alcohol on defendant is an indicator of intoxication. McCown v. State, 192 S.W.3d 158, 164-65 (Tex. App. 2006); Lewis v. State, 191 S.W.3d 335, 341 (Tex. App. 2006); see also Harris v. State, 204 S.W.3d 19, 25 (Tex. App. 2006) (odor of alcohol is evidence of intoxication).

Indeed, defendant even admitted that he had been drinking beer with his friends in the bar. During his testimony, he did not contest that he smelled of alcohol. Accordingly, I find the evidence establishes that defendant did indeed smell of alcohol that morning.

**C.       Slurred Speech.**

Officers Castillo and Serna both testified that defendant's speech was slurred. This testimony is supported by the Alcohol Incident Report, the citation, as well as the Incident Report. Gov't Ex. 3; Def. Exs. 1, 2. His slurred speech is evidence of intoxication. See Harris, 204 S.W.3d at 25; McCown, 192 S.W.3d at 165. I believed these officers when they testified that defendant's speech was slurred. Accordingly, I find the evidence establishes that defendant had slurred speech that morning.

**D.       Bloodshot Eyes.**

Officers Bahr, Castillo, Serna, and Hopes all observed that defendant's eyes were bloodshot. This testimony is supported by the Alcohol Incident Report, the citation, and the Incident Report. Gov't Ex. 3; Def. Exs. 1, 2. His bloodshot eyes are evidence of intoxication. See Harris, 204

S.W.3d at 25; McCown, 192 S.W.3d at 165.

Defendant does not contest that his eyes were bloodshot. Instead, he testified that his eyes were bloodshot because he awoke very early that morning and because Shakers was very smoky. Based on the uncontroverted evidence, I find that defendant's eyes were bloodshot. I do not find defendant's explanation credible.

**E.     HGN Test.**

Officer Serna indicated that defendant failed six out of six possible clues in the HGN test. Such results are indicative of intoxication. See Lewis, 191 S.W.3d at 341 (defendant exhibited all six clues); Burkett v. State, 179 S.W.3d 18, 26 (Tex. App. 2005) (same); Baker v. State, 177 S.W.3d 113, 120 (Tex. App. 2005) (same).

Defendant does not contest that he failed the HGN test. Instead, he posits that any failure resulted from his astigmatism. However, he did not provide any medical evidence to substantiate this claim. See Haskins v. State, 960 S.W.2d 207, 209 (Tex. App. 1997); see also Aguilera v. State, No. 08-04-00002-CR, 2005 WL 1303313, at *6-7 (Tex. App. May 31, 2005) (unpublished) (upholding fact-finder's rejection of defendant's argument that his astigmatism affected his HGN test results). I do not find this explanation to be credible for his failure of the HGN test.

**F.     The Contemporaneous Records.**

The contemporaneous records are significant because they are generally consistent with the Government's version of event. More important, they reflect the experiences and observations of the patrol officers as the events were unfolding.

Defendant presents some inconsistencies in the documents. For example, he points to the fact that Officer Serna's citation indicates that he was driving a Ford Taurus. Def. Ex. 2. The Incident Report accurately reflects that he drove a Ford Escort. Def. Ex. 1, at 3. As Officer Serna

explained, these two models have similar body designs.

Defendant also points out that Officer Serna's Alcohol Incident Report failed to note the number of shaded HGN clues. Gov't Ex. 3. It noted a total of six clues in two different areas. Moreover, it noted three unshaded clues with an "x" in three unshaded boxes. Similarly, it had an "x" in each of three shaded boxes, but did not note the number in the form. I find that this failure was simple human error and does not lead to the inference that defendant did not fail all six HGN clues.

Officer Serna's Alcohol Incident Report indicates that defendant's right and left eyes did not pursue smoothly when he administered the HGN test. Gov't Ex. 3. However, the narrative in the Incident Report by Officer Castillo reads that "SERNA did not observe a lack of smooth pursuit in MARTINEZ's left or right eyes." Def. Ex. 1, at 3. Officer Serna administered the HGN test and recorded his findings. He also provided the results to Officer Castillo. To the extent that Officer Castillo wrote a contrary result in his Incident Report, I do not find it is credible evidence that defendant did not fail the HGN test. I believe Officer Serna's testimony about defendant's HGN test. Moreover, I find the Alcohol Incident Report regarding the HGN test to be reliable.

Finally, defendant argues that because the box for "appears to be drunk" in the section concerning defendant's "vehicle in motion" is not checked that the patrol officers did not believe that he was intoxicated. Gov't Ex. 3. This box, however, concerns a description of the visual that an approaching car provides the observer. Many cars may not strike a witness as being driven in a manner to conclude that the driver is intoxicated. Nonetheless, a driver may still be intoxicated, which is why the section has twenty-one boxes to describe the impression of the approaching vehicle. Id. Moreover, there are several boxes checked concerning the patrol officer's personal contact with defendant that support a finding that they believed he was intoxicated. Id.

As an initial matter, I find that these records are not only reliable, but further bolster the testimony of various patrol officers. Moreover, to the extent that there are the four inconsistencies addressed above, I find that they stem from human error. I found the testimony of all the patrol officers to be credible. In order to accept defendant's version of events, I would have to discount the testimony of all the patrol officers. Defendant's approach would suggest that these officers engaged in a conspiracy through their actions on the early morning of September 22, 2007 as well as in their testimony before the Court. I find no such conspiracy.

Defendant clearly had several drinks in the hours before he drove toward the main gate. I find that he himself believed that he was too drunk to drive, which is why he planned to sleep at his friend's house instead of driving on the highway to his own home. I find that he had difficulty at times following the patrol officers' instructions due to his intoxication.

Next, I find that as an educated person, defendant was not credible when he testified that he did not understand why Officer Hopes was asking for a second breath sample. Moreover, the statutory warning read to him by Officer Hopes explained why the breath sample was being requested. Gov't Ex. 1. Finally, the advisory of implied consent, Gov't Ex. 2, establishes that he was informed he would not be allowed on CCNAS for one year as opposed to the forty days that he claimed in his testimony.

## CONCLUSION

Taken as a whole, I find the evidence establishes beyond a reasonable doubt that defendant was intoxicated and did not have normal use of his mental or physical faculties. Defendant is guilty of driving while intoxicated on federal property. Sentencing will be set after a Presentencing Investigation Report has been prepared consistent with the Federal Rules of Criminal Procedure.

ORDERED this 3rd day of March 2008.

_____
BRIAN L. OWSLEY
UNITED STATES MAGISTRATE JUDGE